UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|     MARCO A. QUISPE ALANYA | ) | Case No. 09-17914-SSM |
|     PATRICIA N. ALAYA DE QUISPE | ) | Chapter 7 |
| | ) | |
|                Debtors | ) | |
| | ) | |
| SCOTT SILVERS | ) | |
| CAROLYN SILVERS | ) | |
|                Plaintiffs | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 09-1452 |
| | ) | |
| MARCO A. QUISPE ALANYA | ) | |
| PATRICIA N. ALAYA DE QUISPE | ) | |
| | ) | |
|                Defendants | ) | |

**MEMORANDUM OPINION**

      This is an action by creditors Scott and Carolyn Silvers objecting to the discharge of the defendants, Marco A. Quispe Alanya and Patricia N. Ayala de Quispe (the "debtors"), based on alleged false oaths or accounts in connection with their bankruptcy filing. A trial was held without a jury on September 3, 2010. The plaintiffs were represented by counsel; the debtors were present in person and represented themselves. At the conclusion of the evidence, the court took the issues under advisement. Having carefully reviewed the evidence, the court finds that although the schedules and statements were incorrect in a number of material respects, the misstatements were not intentional or made with the requisite intent to deceive the trustee or creditors. For that reason, the complaint will be dismissed, and the debtors will be granted a

discharge. This opinion constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(a).

*Background and Findings of Fact*

Marco A. Quispe Alanya and Patricia N. Alaya de Quispe filed a voluntary petition in this court on September 28, 2009, for relief under chapter 7 of the Bankruptcy Code and have not yet received a discharge. On their schedules, they listed $309,390 in unsecured debt, 99% of which represented a debt owed to Scott and Carolyn Silvers. Among the assets listed on their schedules was $9,714 in two savings accounts and a checking account, all of which was claimed exempt. On their schedule of current income (Schedule I), they reported a combined gross monthly income from employment of $5,640, and on their statement of financial affairs reported year-to-date income from employment as $47,997, 2008 income from employment of $54,376, and 2007 income from employment of $72,732. Their chapter 7 statement of current monthly income and means-test calculation (Form B22A), however, shows <u>zero</u> current monthly income. The trustee filed a report of no distribution on November 6, 2009. On December 24, 2009, Mr. and Mrs. Silvers filed the present adversary proceeding objecting to the debtors' discharge under § 727(a)(4)(A), Bankruptcy Code, on the grounds that they knowingly and fraudulently, in or in connection with the case, made a false oath or account in their schedules and statements.

The evidence shows that debtors met Mr. Silvers in 2005 through their real estate agent when they were unable to acquire financing for the purchase of a town home at 9877 Hagel Circle, Lorton, Virginia. The agent contacted Mr. Silvers on the debtors' behalf to set up a Contract for Deed through which Mr. and Mrs. Silvers would buy the home at 9877 Hagel

Circle, and the debtors in turn would purchase it from them over time under an installment sale. Mr. and Mrs. Silvers purchased the property for $283,000, financing $220,000. They then signed a Contract for Deed with the debtors on April 29, 2005, to sell the property to them for $306,000. Under its terms the debtors paid $20,000 as a down payment, and then for the next three years the debtors would make payments on a $286,000 promissory note to Mr. and Mrs. Silvers in monthly installments of $2,356.65 in interest and principal, plus 1/12 of the annual taxes, insurance, and homeowners dues, for a total monthly payment of $2,695.86. The Contract for Deed provided that on April 29, 2008, the $282,165.10 balance of the promissory note would be due in full. The debtors testified that they hoped to refinance or sell the property before the three years had passed.

      Although both of the debtors had been educated and trained as industrial engineers in Peru, they were unable to find professional employment in the United States. They worked in various positions, including as a cook, a maintenance worker, a laborer, and a sales clerk in a bridal shop. The debtors struggled to make the mortgage payments to Mr. and Mrs. Silvers, despite frequently working overtime. Mr. Silvers testified that the debtors asked to meet with him in September of 2007, because they were having problems with the financing and were considering putting the home on the market. Mr. and Mrs. Silvers agreed to reduce the monthly payments in an Amendment to Contract of Deed dated September 17, 2007, to $1,956.65 interest plus 1/12 of the annual taxes, insurance, and homeowners dues, for a total monthly payment of approximately $2,343.11. The lowered payments were not sufficient to pay the entire interest due every month, and the Contract for Deed became a negatively amortized loan. The debtors did not have a translator or attorney present at the meeting to explain the Amendment to Contract

for Deed, though Mr. Silvers testified that both parties had a real estate agent present. The debtors testified that they did not understand that the negative amortization meant that they were increasing the amount of debt that they owed to the plaintiffs at the current rate. The Amendment to Contract of Deed also extended the maturity date to April 29, 2008, when the balance due would be $287,111.02.

The debtors met again with Mr. and Mrs. Silvers to lower the payments as the Amendment to Contract for Deed came due. They signed a Second Amendment to Contract for Deed on April 29, 2008, which lowered their monthly payment to $1,900 ($1,507.53 of interest only plus $392.47, which represents 1/12 of the annual taxes, insurance, and homeowners dues) and extended the maturity date to April 29, 2009.

Even at this lowered rate, the debtors struggled to make their mortgage payments. The debtors rented out a room in their home to a friend in exchange for his contributions toward food expenses (averaging $233 per month), but it was not a sufficient supplement to help them with their mortgage. The debtors testified that they sought out a real estate attorney when they had difficulty making their payments yet again because they hoped to keep their home and the equity that they thought they had built up in it. The real estate attorney explained the negative amortization to them, advising them to file for bankruptcy and accept that they would not be able to keep their home.

Mr. Silvers testified that the debtors stopped making payments after April 2009 but would not leave the property. Mr. and Mrs. Silvers obtained a judgment in Fairfax County

against the debtors for possession of the property and damages of $15,000 for unlawful detainer and were starting to involve the sheriff when the debtors moved out in the summer.[1]

The debtors' marriage had begun to collapse when the financial difficulties with their home surfaced. They separated in the summer of 2009 and stopped direct-depositing their paychecks into a joint account. They moved out of the Hagel Circle home in the summer of 2009. They testified that they had unusually high expenses during that summer as a result of moving to multiple locations, storing their furniture, purchasing items and services to supplement their formerly shared household (e.g., separate beds, cable and internet charges), and paying attorneys' fees (i.e., $1,100 for their divorce, $3,000 for the change in immigration status due to the divorce, and several $500 installments for their bankruptcy).

Ms. Quispe filed for divorce in 2009, but the debtors agreed to solve together the financial troubles that began with their home. The debtors testified that when they met with their bankruptcy attorney in September of 2009, they explained to him that they were married but separating. Their joint bankruptcy petition filed on September 28, 2009, represents that they were married.[2] A divorce decree, however, had been entered by the Circuit Court of Fairfax County on September 21, 2009—one week earlier—although they did not receive a copy of the decree until after their bankruptcy petition was filed. Even then, the decree had typographical

---

[1] After obtaining the judgment, Mr. Silvers sued out a garnishment summons directed to the bank in which the debtors' pay was deposited by their employer. After the petition was filed, the debtors obtained an order from this court on March 17, 2010, directing release of the garnished funds in the amount of $3,183.59.

[2] On the petition, Ms. Quispe's name is listed as "Joint Debtor (Spouse)." On the schedule of monthly income (Schedule I), the debtors' marital status is shown as "separated," although the petition shows the same address for each of them. And on the "means test" form (Form B22A), the debtor report that they are "Married, filing jointly."

errors stating that Patricia Norma Quispe de Alaya was divorced from "Paul R. Stone," and that the divorce occurred in 2008. A subsequent *nunc pro tunc* decree dated December 11, 2009, corrected the name of the husband to Marco Antonio Quispe Alanya and the year to 2009.

The debtors filed their 2009 tax return as a married couple, despite having received their divorce during that year. They testified that their accountant told them that it made no difference whether they filed jointly or separately, and they elected to file jointly and split the accountant's costs evenly.

The debtors' original bankruptcy schedules signed September 12, 2009, lists their gross income on Schedule I as $2,866 and $2,990, which on an annualized basis would have equated to $70,278. On their Statement of Current Monthly Income and Means Test Calculation (Form B22A, or "means test form"), however, they reported zero income. The debtors (whose testimony at the trial was given with the assistance of interpreters) explained that, while they looked over the petition and signed it under penalties of perjury, they did not fully understand what they were signing and relied on their lawyer to explain the forms. They testified further that the explanation of the forms that they received in Spanish was a summary, and that while they were familiar with some of the English on the form, it was too technical for them to understand thoroughly without guidance. The debtors testified that they were confident that their lawyer would be able to provide accurate information to the court because they had provided substantially all of their financial documentation (except what was misplaced due to their moves) to their attorney, and that they had expressed a desire that their attorney disclose everything. The debtors testified that they had provided sufficient documentation for their attorney and his

staff to make a complete disclosure, but due to their limited English skills, they did not know what information should be included in which sections of the petition.

As soon as Mr. Silvers brought the errors on Form B22A to the debtors' attention at the creditors' meeting in November of 2009, they spoke with their attorney about the omission. The attorney explained that the first filing was a "skeleton" version, and that the proper numbers would be included in an amended filing for the court. An amended Form B22A was not filed, however, until January 4, 2010—after the present adversary proceeding was commenced—reporting the debtors' annualized income at $63,876, which the debtors testified correctly reflected their earnings. This value was less than the annualized amount implied by their Schedule I and was just below the state-wide median income of $65,342 for a household size of two in Virginia. This Form B22A, however, still did not reflect the debtors' divorced marital status. Finally, on May 7, 2010, separate amended Forms B22A were filed for each debtor. These listed Mr. Quispe's annualized income as $40,704 and Ms. Quispe's as $44,568, which for each of them was below the state-wide median of $49,689 for a household size of one. Although the debtors testified that they believed the income shown on the second amended forms was inaccurately high, the court's own calculation (based on the pay stubs admitted into evidence and the evidence as to the rent they received from their boarder) reflects that the reported amounts are correct.

*Conclusions of Law and Discussion*

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of

Virginia dated August 15, 1984. An objection to discharge is a core proceeding in which a final judgment may be entered by a bankruptcy judge, subject to the right of appeal. 28 U.S.C. § 157(b)(2)(I). Venue is proper in this district under 28 U.S.C. § 1409(a). The debtors have been properly served and have appeared generally.

## II.

An individual debtor will be denied a discharge if, among other conduct, "[t]he debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]" § 727(a)(4)(A), Bankruptcy Code. In a complaint objecting to the debtor's discharge, the burden of proof is on the objecting party, and the standard of proof is preponderance of the evidence. *Harmon v. McGee (In re McGee)*, 157 B.R. 966, 973 (Bankr. E.D. Va. 1993).

With respect to § 727(a)(4), courts have recognized that competing concerns are at stake. *Nat'l Post Office Mail Handlers, Watchmen, Messengers & Group Leaders Division v. Johnson (In re Johnson)*, 139 B.R. 163, 165 (Bankr. E.D. Va. 1992), *citing Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987). On the one hand, bankruptcy is an equitable remedy in which "the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor." *Johnson*, 139 B.R. at 166. On the other hand, the very purpose of § 727(a)(4)(A) is to ensure that "those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs," and that "complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." *Id.*

As the Fourth Circuit has explained, "[i]n order to be denied a discharge under this section, the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." *Williamson v. Fireman's Fund Ins. Co. (In re Williamson)*, 828 F.2d 249, 251 (4th Cir. 1987). Further, "because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." *Id.* at 252, *quoting In re Devers*, 759 F.2d 751, 753-4 (9th Cir. 1985). Finally, "the false oath made by the debtor must have related to a material matter." *Williamson*, 828 F.2d at 251. The subject matter of a false oath is "material," and thus sufficient to bar discharge, "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id.* at 252, *citing Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

III.

Mr. and Mrs. Silvers allege that the debtors violated § 727(a)(4)(A) by falsely reporting their income on the means test form as being below the state-wide median to avoid triggering the chapter 7 "means test," by misstating their marital status, and by failing to disclose the transfers of substantial sums that they had in savings but that vanished in the months leading up to the bankruptcy filing.[3] To resolve the issue, the court must first determine whether the evidence

---

[3] In their complaint—which was filed *pro se* before counsel entered an appearance on their behalf—Mr. and Mrs. Silvers also alleged that the debtors' Schedule B was false because it did not list as <u>assets</u> several potentially avoidable preferences and gifts. Complaint ¶¶ 22, 23, 24, 26 and 27. However, potential avoidance recoveries are not required to be listed on Schedule B, since such recoveries are not property of the debtor, but of the bankruptcy estate. Information concerning transfers (whether or not avoidable) made within the preference period or within the avoidance period for actually or constructively fraudulent conveyances is instead reported on the
(continued...)

establishes that the debtors made one or more materially false statements and then whether the debtors had the requisite intent to deceive. *Williamson*, 828 F.2d at 251.

A.

The court will first address the means test form. As noted, the Form B22A that was initially filed showed <u>zero</u> average monthly income for the six months preceding the month in which the petition was filed. This was clearly false, since the debtors readily admit that they were gainfully employed during that period of time. It would certainly have been helpful if the attorneys who filed the petition and prepared the form had testified as to the reason for the error and why it took so long to file a corrected form.[4] Since the attorneys obviously had sufficient information to file Schedule I, which reported the debtors' income as of the filing date, and the statement of financial affairs, which reported their income for 2009 year-to-date, it is a mystery, to say the least, why that same income was not reflected on the means test form. If, as the debtors testified, their attorney told them after the meeting of creditors that a "skeletal" form had been filed (presumably as a kind of place-holder until the attorney had sufficient information to file a properly-completed form), that explanation certainly reflects no credit upon the attorney,

---

(...continued)
Statement of Financial Affairs. In this case, the debtors did report the transfers of which the plaintiffs complain on the Statement of Financial Affairs and thus fully complied with their disclosure obligation. At trial, counsel for Mr. and Mrs. Silvers did not further pursue the issue, and the court need not further discuss it.

[4] This is not, unfortunately, the first case in which a completely blank Form B22A was initially filed (although not by the same attorneys). *See In re Jasper,* 414 B.R. 83 (Bankr. E.D. Va. 2009). In *Jasper*, the attorney's explanation was that the blank form was generated as a result of a "glitch" in the bankruptcy form preparation software. 414 B.R. at 84, n.1. As nearly as the court can determine from the attorney's explanation, the problem was that if the bankruptcy filing actually occurred in a calendar month subsequent to the original intended month of filing, the means test form was reset to zeros awaiting the input of wage information for the missing month.

given that a filled-out version of the form was not filed until some two months after the meeting of creditors.

There can be no question that the Form B22A is a key component of the "means test" instituted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 ("BAPCPA").  The test seeks to ensure that debtors who can afford to repay at least a portion of what they owe their creditors do not abuse the bankruptcy process by filing under chapter 7.  Under the means test, a presumption of abuse arises if the debtor's "current monthly income," minus certain specified allowances and expenses, multiplied by 60, exceeds $6,575 (provided that would pay at least 25% of nonpriority unsecured claims), or $10,950, regardless of the amount of the claims.  § 707(b)(2), Bankruptcy Code.  Although the presumption of abuse can be rebutted, it requires a showing of special circumstances. § 707(b)(2)(B), Bankruptcy Code.  However, the presumption of abuse only applies if the debtor's current monthly income exceeds the state-wide median income for a household of the same size.  § 707(b)(7), Bankruptcy Code.  "Current monthly income" is defined as the average of the debtor's income from all sources (with certain exceptions, such as Social Security benefits) received in the six months <u>preceding</u> the month in which the petition is filed. §101(10A), Bankruptcy Code.[5]  Thus current monthly income determines whether the debtor is subject to means testing at all, and, if so, is the starting point for the calculation to determine whether, after the permitted deductions, there is a presumption of abuse.  But it is not correct to say, as counsel for Mr. and Mrs. Silvers suggested at the hearing, that a person whose income

---

[5] Because "current monthly income" is a calculated historical figure, it may well differ from the "current" income reported on Schedule I, which represents what a debtor is currently receiving, as opposed to what he or she received in the six-month period used for the means test computation.

exceeds the state-wide median is not "eligible" for chapter 7 relief—that depends entirely on whether, after the permitted deductions, the debtor's 60-month disposable income exceeds permitted levels.  Be that as it may, in the present case neither the trustee nor creditors could have readily made that determination, since the form reported an incorrect figure for the starting point of the calculation, namely the current monthly income.  Accordingly, the court can only conclude that the means test form, as filed, was false, and that the misstatement was material.

It is, of course, true that the original form has been twice amended and that the final amendment appears to correctly reflect the income actually received by the debtors from employment and from renting out the room in their house during the six months preceding the month in which they filed their petition.  However, mere amendment of schedules or statements that were false when filed does not prevent discharge from being denied based on the original filings.  On the other hand, prompt amendment of schedules and statements may—depending on whether they were made by a debtor without prompting or only after questions were raised by the trustee or creditors—be probative on whether the original errors were inadvertent or intentional.  Here, the corrections were only made after the original filing was challenged by the creditor, and even then, not until after an adversary proceeding was filed based on the omission.  Thus, any inference of inadvertence that may flow from amendment of the original means test form is relatively weak.  At the same time, the debtors were hardly hiding the fact that they had significant income, and might, indeed, be subject to the means test, since their Schedule I plainly reflects a combined annualized income that is above the state-wide median.  Put another way, creditors and the trustee were clearly placed on notice that the debtors' income might implicate

the means test and could, even without proper completion of the form, have brought a motion under § 707(b), Bankruptcy Code, to dismiss the debtors' case.

Any analysis of whether the debtors' income actually met the threshold for application of the means test is complicated, to say the least, by the filing of a joint petition when the debtors were not in fact married. Had separate cases been filed, each debtor's annualized income from employment and rent during the 6-month test period would have been below the state-wide median for a family size of one. However, to the extent they were still living together during that period, each would have had to report on Line 8 of the means test form any amounts regularly paid by the other for the reporting debtor's household expenses. If those amounts were included, it is at least possible that one or both of the debtors would have a calculated current monthly income above the state-wide median.

In the context of the present litigation, however, the issue is not whether or not the debtors' case is actually subject to dismissal for abuse, but whether the debtors intended to mislead the trustee, United States Trustee, or creditors as to whether it was. Put another way, the principle of "no harm, no foul" has no applicability, and a false statement is not made less material simply because, at the end of the day, a correct statement would not have affected the administration of the case. Be that as it may, having heard the debtors testify and having observed their demeanor, the court is unable to find that they intended to deceive anyone when they filed either their original or first amended means test forms. Certainly, there was gross lack of attention to detail. While more blame may devolve upon the attorneys than upon the debtors with respect to the original Form B22A—particularly given the debtors' limited English-language proficiency—the debtors must share at least some of the blame, since it is difficult to

see how even a person totally unfamiliar with the papers that are required to be filed in a bankruptcy case would not question a form that reports zero income when the debtors knew they had income. But negligence, however censurable, is not same as intent to deceive. Accordingly, discharge will not be denied based on the incorrect information on the means test form.

B.

The court will next address the misstatement as to the debtors' marital status on the petition, schedules, and means test form. It is easy enough to understand why the debtors filed as a married couple—even though they obviously knew a suit for divorce was pending—since they did not receive a copy of the decree until after the bankruptcy petition had been filed (and even then, it needed correction to correctly recite Mr. Quispe's name). But it is somewhat harder to understand why they did not immediately bring that fact to their attorney's attention once they received a copy of the decree. Since only a married couple can file a joint petition, at that point the cases should have been deconsolidated and should have proceeded separately. *In re Wilkerson*, 2006 WL 3694638, *3 (Bankr. M.D. Ga. 2006) (stating that when debtors filed jointly despite not being legally married, "the appropriate remedy . . . is severance or deconsolidation of the case.") Aside, however, from the requirement to pay to pay an additional filing fee, it is not clear that the misrepresentation of marital status would have affected the debtors' exemptions or their ability to proceed in chapter 7. Indeed, had they filed separately, it appears likely that the means test would not have been implicated at all since their respective separate incomes (even including the income from renting out the room in their house) were below the state-wide median for a family size of one. Again, however, the issue is not whether the means test would or would not have been triggered, but whether the debtors had the required

intent to deceive when they listed their marital status as "separated" rather than "divorced." Having considered the debtors' explanation and having had an opportunity to observe their demeanor while testifying, the court can only conclude that they did not.

C.

Finally, Mr. and Mrs. Silvers allege that the debtors have either hidden money or deliberately spent large amounts of their savings in the summer of 2009 in a conscious effort to bring their savings below the amount they could exempt under Virginia law. *See* Va. Code Ann. §§ 34-4, 34-13 (allowing husband and wife each a basic $5,000.00 homestead exemption in either real or personal property). Specifically, they point to the fact that the debtors' bank statements reflect that on July 27, 2009 (two months prior to the filing of their petition), they had a total of $28,378 in savings and checking, while a week prior to the filing they had only approximately $11,400. The evidence, however, readily shows that the debtors had higher expenses than usual that summer for additional expenses they faced both because of their divorce and eviction, and for their legal bills. Simply put, the court cannot find that the debtors have salted money away in a hiding place or were spending down their savings for the purpose of defrauding their creditors.

IV.

In summary, although the evidence plainly shows that the debtors materially misstated their income and marital status in their original filing, the court does not find that the plaintiffs have met their burden of proving that the misstatements were made willfully and with intent to

defraud.  Judgment will therefore be entered dismissing the complaint.  By separate order, however, the court will require the severance of the jointly-filed case and the payment of the required fee for dividing a joint case.  28 U.S.C. § 1930 Appendix, Bankruptcy Court Miscellaneous Fee Schedule, Item 21.

 Date: _____        _____
                                             Stephen S. Mitchell
Alexandria, Virginia                         United States Bankruptcy Judge


Copies to:

Thomas M. Curtis, Esquire
6405 Fleetside Ct.
Alexandria, VA 22310
Counsel for the plaintiffs

Marco A. Quispe Alanya
Patricia N. Ayala de Quispe
10210 Colston Ct., Apt. 104
Burke, VA 22015
Defendants *pro se*